UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MAMMOET SALVAGE AMERICAS, INC., | § § § | |
| Plaintiff, | § § | |
| VS. | § | CIVIL ACTION NO. 3:13-CV-00258 |
| | § § | |
| GLOBAL DIVING & SALVAGE, INC., | § § § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

A number of companies settled a lawsuit arising from the death of a commercial diver who was performing an underwater inspection of a vessel en route to a salvage operation in the Bay of Campeche. In this case, two of the companies—Global Diving & Salvage, Inc., the diver's employer, and Mammoet Salvage Americas, Inc., which had chartered the vessel and was in charge of the salvage operation—dispute the extent of an indemnity obligation. Global agrees that it must cover the portion of the settlement attributable to Mammoet's conduct pursuant to a Services Agreement between the parties because the decedent was its employee, and has already done so. But Global disagrees that it also must pay the amount of the settlement attributable to the conduct of another entity that managed and operated the vessel, River Till Shipping, Ltd., whom Mammoet had agreed to indemnify in a separate agreement. The parties acknowledge that federal maritime

law governs this issue and that the undisputed factual record allows the Court to decide it on their competing motions for summary judgment.

## I. BACKGROUND

Mammoet was hired to perform a salvage operation to recover three pipe legs and mats lost from a platform operated by Pico Energy in the Bay of Campeche. To conduct this salvage operation, Mammoet needed a boat and divers.

### A. The Chartering Agreements

Mammoet chartered the M/V TOPAZ CAPTAIN (the "Vessel"). The lineage of that charter is as follows. The Vessel's owner has a bare-boat charter with River Till, which is charged with managing and operating the Vessel. River Till time chartered the Vessel for a year to Boa Marine Services, Inc. Boa, in turn, chartered the Vessel to Mammoet for the time period covering Mammoet's salvage operations in the Bay of Campeche.

The charter between Mammoet and Boa was governed by a BIMCO Time Charter Party for Offshore Service Vessels (SUPPLYTIME 2005 Form). The charter defined "Boa's Group" and "Mammoet's Group" to include the named entities as well as "their contractors and subcontractors." Docket Entry No. 2-4 ¶ 14(a). The charter provided that:

> Boa "shall not be responsible . . . for personal injury or death of any member of [Mammoet's] Group or of anyone on board anything

> towed by the Vessel, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, liability, injury or death is caused wholly or partially by the act, neglect or default of [Boa's] Group, and even if such loss, damage, liability, injury or death is caused wholly or partially by the unseaworthiness of any vessel; and [Mammoet] shall indemnify, protect, defend and hold harmless [Boa] from any and against claims, costs, expenses, actions, proceedings, suits, demands, and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury or death.

*Id.* ¶ 14(b)(ii). The Boa–Mammoet charter also contains a "Himalaya Clause" stating that any indemnity provided under the agreement "shall also apply to and be for the benefit of [Boa's] parent, affiliated, related and subsidiary companies, [Boa's] contractors, sub-contractors, the Vessel, its Master, Officers, and Crew, its registered owner, [and] its operator . . . ." *Id.* ¶ 14(e)(ii). Mammoet concedes that it must indemnify River Till as River Till is the Vessel's "operator" within the meaning of this Himalaya Clause. It is that indemnity obligation for River Till's conduct that Mammoet seeks to pass on to Global.

### B.  The Services Agreement Between Mammoet and Global

Having secured a boat, Mammoet hired Global to provide divers to assist in Mammoet's salvage operation. Mammoet and Global entered into a Services Agreement that contained the following indemnification provisions:

> a. <u>Allocation of Liabilities</u>. Other than with respect to pollution matters set forth in Section 8 above, the parties agree to the following allocation of liabilities:

1) <u>Company</u>.[1] Company shall be responsible for all loss or damage to its vehicles, vessels, equipment and other property owned, hired, chartered or leased and utilized by Company or its subcontractors incident to or in association with the Services performed hereunder; and all illness, bodily injury and/or death of Company's employees and the employees of any subcontractors of Company, howsoever caused and even if resulting from the negligence, strict liability or other legal fault of Customer or any other contractors of Customer.

2) <u>Customer</u>. Customer shall be responsible for all loss or damage to its vehicles, vessels, equipment and other property (to include the Pico IV) owned, hired, chartered, operated or leased by Customer, its customers, including Pico Energy, and other contractors (or such other contractors' subcontractors) incident to or in association with the Services and/or the Project, and all illness, bodily injury and/or death of Customer's employees and the employees of its customers, including Pico Energy, and/or of any other contractors of Customer (or such other contractors' subcontractors), howsoever caused and even if resulting from the negligence, strict liability or other legal fault of Company or its subcontractors.

3) <u>Residual</u>. As to any such matter not specifically addressed in Paragraphs 9.a.1) and 9.a.2) above, Company and Customer shall each be responsible for any loss, damage, expense, liability, claim and/or suit to the extent of its proportionate degree of negligence or other legal fault.

b. <u>Indemnity</u>.   Each party agrees to indemnify and hold harmless (including legal fees and costs) the other party of and from any and

---

[1] "Company" refers to Global and "Customer" refers to Mammoet.

all loss, expense, damage, liability, claim, suit, fine and/or penalty arising from or relating to any responsibility allocated to it pursuant to Section 9.a above.  In furtherance of the foregoing, each party shall waive any immunity from suit and exclusivity of remedy afforded by any workers compensation or similar law.

Docket Entry No. 2-2 § 9.  Global acknowledges that this agreement requires it to indemnify Mammoet for Mammoet's tortious conduct that may have caused the death of Global's employee.  Docket Entry No. 7 at 18–19.



### C. The Lawsuit and Settlement

While the Vessel was on its way to the Bay of Campeche, it experienced technical issues and the Vessel Master requested that the Global dive team perform an underwater inspection. During this inspection, the oxygen line to diver Bradley Sprout was cut, depriving him of oxygen and tragically resulting in his death.

Sprout's estate filed suit in both state and federal court asserting various personal injury claims. Docket Entry No. 2 at 3–4. The parties agreed to a settlement allocating responsibility among numerous defendants. In the agreement, Mammoet and Global agree to resolve the dispute concerning who must pay for River Till's exposure in this separate declaratory judgment action.

## II. DISCUSSION

Mammoet makes two arguments in support of its position that Global must cover Mammoet's indemnity obligation to River Till. First, it contends that River Till is included as a third-party indemnitee under the Mammoet–Global Services Agreement. The Agreement requires Global to indemnify all claims related to the death of a Global employee even if resulting from the "negligence, strict liability, or other legal fault of [Mammoet] or any other *contractors* of [Mammoet]," and Mammoet argues River Till was its contractor. Docket Entry No. 2 at 12–16; Docket Entry No. 2-2 §9.a(1) (emphasis added). Second, Mammoet contends that even if River Till is not its "contractor" or otherwise listed as an indemnitee in the

6 / 18

Services Agreement, Mammoet's contractual liability to River Till is part of the "loss, expense, damage, [and] liability" resulting from the death of a Global employee for which Global agreed to be responsible in Section 9.b of the Services Agreement. Docket Entry No. 2 at 16–19.

Both of these arguments must be evaluated in light of the principle that the "obligation to indemnify is to be strictly construed, and a court should not construe an indemnity clause to impose liability for a loss neither expressly within its terms nor of such a character that the parties probably intended to exclude the loss." *Duval v. N. Assurance Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013) (internal quotation marks and citations omitted); *see also Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 305 (1959) ("[C]ontracts purporting to grant immunity from, or limitation of, liability must be strictly construed and limited to intended beneficiaries, for they are not to be applied to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the understanding of the contracting parties." (internal quotation marks and citation omitted)). This is because a "contract to indemnify another for his own negligence imposes an extraordinary obligation. Thus an indemnitor is entitled to express notice that under his agreement, and through no fault of his own, he may be called upon to pay damages caused solely by the negligence of his indemnitee. For the same reasons express notice is

required where a party seeks to shift his contractual liability to indemnify a third party." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981). The justification for express notice is even stronger in the latter situation of third-party indemnification because a party is being held liable for the conduct of an unidentified entity about which it may lack useful information, such as its experience or safety record.

### A. Does The Services Agreement Between Mammoet and Global Include River Till As An Indemnitee?

That express notice is lacking when it comes to Mammoet's argument that Global is responsible for River Till's exposure because River Till is a contractor of Mammoet. Section 9.a(1) makes Global responsible for the death of its employees, "even if resulting from the negligence, strict liability or other legal fault of [Mammoet] or any other contractors of [Mammoet]." Docket Entry No. 2 at 12–13. River Till is not Mammoet's contractor for the simple reason that there is no contract between those entities (Mammoet's contract for the charter was with Boa). *See* BLACK'S LAW DICTIONARY 375 (6th ed. 2009) (defining "contractor" as a "party to a contract" or "one who contracts to do work or provide supplies for another"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 495 (2002) (defining "contractor" as "one that contracts: a party to a bargain: one that formally undertakes to do something for another"); *cf. Bayou Steel Corp. v. Nat'l Union Fire Ins. Co.*, 642 F.3d 506, 511 (5th Cir. 2011) (considering Black's Law

and Webster's definitions of "subcontractor" in explaining that a subcontract requires the "pre-existence of a primary contract").

Even if River Till were considered Mammoet's subcontractor—a dubious proposition given that River Till is upstream from Mammoet in the chartering chain—the term "contractor" would not normally encompass subcontractors. That is especially true in this case because there are numerous references to "subcontractor" elsewhere in the same section of the Services Agreement, *see* Docket Entry 2-2 § 9.a(1) ("[Global] shall be responsible for . . . all illness, bodily injury and/or death of [Global's] employees and the employees of any subcontractors of [Global]."), including the otherwise reciprocal express negligence clause for injuries of Mammoet employees in which Mammoet is responsible "even if resulting from the negligence, strict liability, or other legal fault of [Global] or its *subcontractors*."[2]  *Id.* § 9.a(2) (emphasis added). The contrast is even starker with the subcontractor language included in the indemnity provision at issue in *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358 (5th Cir. 2009), upon which Mammoet relies. In that case the indemnitor agreed to cover the conduct of the indemnitee "and its contractors *and subcontractor(s) of any*

---

[2] This difference in which Mammoet agrees to cover any losses resulting from its employee's death attributable to the conduct of Global "or its subcontractors," but Global does not indemnify for losses resulting from its employee's death if caused by Mammoet's subcontractors may result in part from the greater likelihood that Global, as Mammoet's contractor, would hire subcontractors. This reinforces the Court's doubt, expressed above, that an upstream entity like River Till would be considered Mammoet's subcontractor.

*tier.*" *Id.* at 361 (emphasis added).  Finally, Mammoet seems to want to use the Himalaya Clause in its agreement with Boa to define who is its contractor under the Services Agreement with Global.  Docket Entry No. 2 at 16.  But that Himalaya Clause—whose broad language gives rise to Mammoet's obligation to indemnify River Till even though those parties did not contract with one another—does not bind a nonsignatory like Global.  *See Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 217 (5th Cir. 2003) ("It goes without saying that a contract cannot bind a nonparty." (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)).  If anything, the existence of the Himalaya Clause in the Boa–Mammoet agreement—and its absence in the Mammoet–Global agreement—further demonstrates that Mammoet and Global did not agree to expand the group of indemnitees in their contract to include a third party like River Till.

Two cases briefly cited by Mammoet demonstrate that the language needed to include third parties like River Till as indemnitees is lacking in this case.  In one, the indemnity provision between the owner of a vessel and its charterer extended the owner's indemnity obligation to "affiliated companies" of the charterer, one of which was Exxon.  *See Lirette v. Popich Bros. Water Trans., Inc.*, 699 F.2d 725, 726 n.4, 728 (5th Cir. 1983) (explaining that the owner's "obligation to reimburse [the Charterer] for amounts due to Exxon arose, not because of the separate agreement [the Charterer] had with Exxon, but because of [the Owner's]

express undertaking to make good to Exxon all such losses."). In the other, Halliburton had agreed to indemnify LLOG (an offshore well operator) "and its invitees" against claims by Halliburton employees. When a Halliburton employee was injured, LLOG sought indemnification not just for its own tort liability but also for that it had agreed to pay in a separate agreement for Falcon, which had provided the drill barge where the injury occurred. LLOG then filed suit against Halliburton seeking to recover Falcon's share of liability. The Fifth Circuit ruled in favor or LLOG because Falcon was LLOG's invitee, and invitees were identified as indemnitees in the Halliburton-LLOG indemnity provision. *St. Paul Surplus Lines Ins. Co. v. Halliburton Energy Servs., Inc.*, 445 F.3d 820, 821 (5th Cir. 2006) ("The LLOG/Halliburton Service Contract required Halliburton to indemnify LLOG and its invitees, which included Falcon, against claims by Halliburton employees."); *see also Mills v. Zapata Drilling Co.*, 722 F.2d 1170, 1174–75 (5th Cir. 1983) (finding that Zapata was an invitee under the terms of an indemnity agreement between two other parties and thus the indemnitor's obligation extended to Zapata's conduct), *overruled on other grounds by Kelly v. Lee's Old Fashioned Hamburgers, Inc. (Lee's Old Fashioned Hamburgers of New Orleans, Inc.)*, 908 F.2d 1218 (5th Cir. 1990) (per curiam).

The list of indemnitees in section 9.a(1) of the Mammoet–Global Services Agreement does not include "affiliated companies" or "invitees" of Mammoet, or

some other term that might encompass River Till; only Mammoet "or any [of its] contractors" are identified. Because River Till is not a contractor of Mammoet, this provision fails to extend Global's indemnity obligation to the tortious conduct of River Till. Reading such a requirement into the Services Agreement would give Mammoet a benefit that it did not negotiate and for which Global did not have express notice. *See Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1217 (5th Cir. 1986) ("In determining whether an indemnity agreement governs a particular claim, the courts should look first to the language of the agreement."); *see also Foreman v. Exxon Corp.*, 770 F.2d 490, 498 (5th Cir. 1985) ("Offshore's obligation to indemnify Exxon for Exxon's contractual liability to Diamond M may arise only from the plainly expressed intention of the parties, spelled out in unambiguous terms.").

### B. Is Global Responsible For Mammoet's Contractual Liability Arising From The Death Of A Global Employee?

Even if unsuccessful on the "contractor" question, Mammoet contends that Global nonetheless is on the hook for River Till's tortious conduct because the language of Section 9.b of the Services Agreement is broad enough to cover not just Mammoet's tort liabilities arising from the death of a Global employee but also its contractual liabilities. As discussed above, those contractual liabilities arose from the Himalaya Clause in Mammoet's agreement with Boa, which required it to indemnify River Till.

Section 9.b provides that "Each party agrees to indemnify and hold harmless . . . the other party of and from any and all loss, expense, damage, liability, claim, suit, fine and/or penalty arising from or relating to any responsibility allocated to it pursuant to Section 9.a above." Indeed, when included in a clause listing the covered indemnitees, "all loss," "all liability," and "all claims" are the types of broad indemnity language that courts have held includes contractual as well as tort liability. *See, e.g.*, *Breaux*, 562 F.3d at 365 ("The agreement does not limit indemnity to only tort claims for personal or bodily injury, illness, disease, or death, but the agreement unambiguously encompasses indemnity for Unocal and 'its contractors,' in this case HES, against 'all liability' arising out of those claims."). The problem for Mammoet is that section 9.b ties this broad language to the "responsibility allocated" to a party in section 9.a. And section 9.a(1) is best read as making Global responsible only for the tort liability Mammoet incurs as the result of the death of a Global employee. It reads in relevant part that Global "shall be responsible for . . . all illness, bodily injury, and/or death of [its] employees and the employees of any subcontractors of [Global], however caused and even if resulting from the negligence, strict liability, or other legal fault of [Mammoet]." The "legal fault" language of this express negligence clause rejects Mammoet's attempt to expand Global's indemnification obligation to include Mammoet's

contractual indemnification obligations.[3]

The placement of "other legal fault" after "negligence" and "strict liability" weighs against Mammoet's argument. "Legal liability"—the term read to encompass contractual liability in *Breaux*—is a broader concept than "legal fault." "Liability" is a fairly generic term with applicability across the entire universe of legal claims. *Cf. Stine v. Marathon Oil Co.*, 976 F.2d 254, 260 (5th Cir. 1992) ("The clause uses the word 'liability'—'a broad legal term' whose meaning includes 'legal responsibility' and 'responsibility for torts.'" (citing BLACK'S LAW DICTIONARY 914 (6th ed. 1990))); *Fed. Ins. Co. v. New Hampshire Ins. Co.*, 439 F. App'x 287, 291 (5th Cir. 2011) (per curiam) ("While the phrase 'legal liability' includes liability assumed by contract, the phrases 'liability imposed by law,' and 'legally obligated to pay as damages' do not." (quoting 7A Lee R. Russ & Thomas

---

[3] In addition to the problem that section 9.b expressly incorporates section 9.a, Mammoet's argument that section 9.b rather than 9.a(1) is the key provision defining the extent of the indemnity obligation faces other difficulties. If section 9.b on its own provides such broad indemnification, then the express negligence clause in section 9.a is superfluous. Mammoet tries to argue that the express negligence provision in section 9.a "enlarges, rather than limits, the scope of the indemnity coverage and does not alter the fact that the indemnity provision [9.b] by its terms extends to any and all liability arising from or relating to the death of Brad Sprout, including contractual liability." Docket Entry No. 11 at 8. But for section 9.a to enlarge the indemnity obligation would mean that the broad language Mammoet cites in section 9.b creates an indemnity obligation for contractual liability but not tort liability—a result that makes little sense.

The conclusion that section 9.a controls the scope of the indemnity obligation between Global and Mammoet finds further support in the case law indicating that such a provision expressly identifying the indemnitee(s) is necessary to satisfy the express notice requirement. *See, e.g.*, *Seal Offshore, Inc. v. American Standard, Inc.*, 736 F.2d F.2d 1078, 1081 (5th Cir. 1984) ("An indemnification of 'any and all claims' will not include the negligence of the indemnitee.").

F. Segalla, COUCH ON INSURANCE §103:14 (3d ed. 2008)).  "Fault," on the other hand, is a term usually connected with tort.  *See Cont'l Ins. Co. v. Sabine Towing Co.*, 117 F.2d 694, 697 (5th Cir. 1941) ("It is the settled rule that fault in legal literature is the equivalent of negligence."); *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1434 (5th Cir. 1983) (Politz, J., dissenting) ("Fault is blameworthiness.  'Fault in legal literature is the equivalent of negligence.'" (quoting *Cont'l Ins. Co.*, 117 F.2d at 697)); BLACK'S LAW DICTIONARY 683 (9th ed. 2009) (defining fault as "[t]he intentional or negligent failure to maintain some standard of conduct when that failure results in harm to another person," and listing "contractual fault" as a separate term); C.J.S NEGLIGENCE §15 (2013) ("'Fault' may be deemed to be synonymous with . . . 'negligence'".).  That ordinary meaning of fault is reinforced here by the canon of *eiusdem generis*, which provides that when "general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated."  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 218 (5th Cir. 2007) (quoting *First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In re Biloxi Casino Belle Inc.)*, 368 F.3d 491, 500 (5th Cir. 2004)).  Mammoet counters that reading "legal fault" to apply only to tortious conduct renders it redundant given the preceding term "negligence."  Docket Entry No. 11 at 9 ("'Legal fault' must mean more than negligence as the clause previously mentions

'negligence.'"). But there is tortious conduct that is distinct from negligence. Unseaworthiness, which may have been a basis for liability in this case, is just one example. *See Davis v. Abdon Callais Offshore, Inc.*, 2013 WL 5775907, at *5 (S.D. Tex. Oct. 25, 2013) (noting the "subtle but meaningful distinctions between negligence and seaworthiness claims" and that "unseaworthiness is conceptually distinct from Jones Act negligence" (quoting Thomas Schoenbaum, ADMIRALTY AND MARITIME LAW § 6–25, at 494 (5th ed. 2011))). Economic torts, which were covered by the indemnity agreement at issue in *Sumrall v. Ensco Offshore Co.*, 291 F.3d 316, 318 n.4 (5th Cir. 2004) (listing "misrepresentation" as a tort covered under the agreement), are another.

Mammoet cites cases finding that an indemnity clause extended to contractual as well as tort liabilities. The possibility of such an agreement is not in doubt, but its existence again turns on the language used. And the expansive language that gave rise to the obligation for contractual liabilities in those cases shows that the required express notice is lacking here. In *Breaux*, the Fifth Circuit found that the "agreement unambiguously encompasses indemnity . . . against 'all liability' arising out of those claims," including contractual liability. 562 F.3d at 365. That broad "all liability" language was reinforced elsewhere in the agreement when it said the indemnity applied "to the maximum extent permitted by the applicable law," and referred to "'each and every case, irrespective' of whether the

indemnitee was 'negligent . . . . or otherwise legally liable (with or *without fault* or whether strictly liable or in breach of any warranty).'" *Id.* at 361 (italics added); *see also id.* at 366 (relying on the "or otherwise legally liable" language). As discussed above, the Services Agreement's language uses the more limited term "legal fault." The contract language in *Sumral*, 291 F.3d at 316, is even more emphatic about the extension of the indemnity obligation to contractual liability. The indemnitor agreed to indemnify the indemnitee, as well as its "contractors" and "subcontractors," against "*all claims*, losses, costs, demands, damages, suits, . . . *and causes of action of whatsoever nature or character* . . . *and whether arising out of contract, tort,* strict liability, unseaworthiness of any vessel, misrepresentation, violation of applicable law and/or any cause whatsoever . . . " *Id*. at 318 n.4 (italics in original). The language in the Mammoet–Global Services Agreement contains nothing of this sort. It is more like the indemnity provision in *Corbitt*, which led the Fifth Circuit to conclude that "there is nothing in the contractual language itself or in the realities of the situation in which the parties executed [the indemnification agreement] which reflects any such intention" to "create a right of indemnity for independent contractual liabilities." 654 F.2d at 334.

### III. CONCLUSION

For the reasons given above, Mammoet has not identified a source in its agreement with Global that provides the express notice necessary to pass its obligation to indemnify River Till on to Global.  River Till is not included as a third-party indemnitee in the Services Agreement, and that agreement does not provide indemnity for Mammoet's contractual liabilities.  Accordingly, Mammoet's Motion for Summary Judgment (Docket Entry No. 2) is **DENIED** and Global's Cross Motion for Summary Judgment (Docket Entry No. 7) is **GRANTED.**  Global shall file a proposed final judgment consistent with this ruling within seven days of the entry of this Memorandum and Order.

**SIGNED** this 27th day of November, 2013.

_____
Gregg Costa
United States District Judge